UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

| | |
|---|---|
| B.I. INFANT, by father Arthur Iskhakov,<br><br>Plaintiff,<br><br>v.<br><br>CHAZAQ ORGANIZATION USA INC., et al,<br><br>Defendants. | Case No. 1:20-cv-01910-PK<br><br>Brooklyn, New York<br>September 19, 2022 |

TRANSCRIPT OF ORAL ARGUMENT HEARING
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Martin Druyan, Esq.<br>Martin Druyan and Associates<br>Nelson Tower<br>450 7th Avenue<br>Suite 704<br>New York, NY 10123 |
| For the Defendant:<br>(Commonpoint Queens) | Daniel Milstein, Esq.<br>Aaronson Rappaport Feinstein & Deutsch<br>600 Third Avenue<br>New York, NY 10016 |
| For the Defendant:<br>(City of New York) | Mark G. Toews, Esq.<br>New York City Law Department<br>100 Church Street<br>New York, NY 10007 |
| Clerk: | Lindsay Gus |
| Court Recorder: | Electronic Sound Recording |

Transcription Service: Chris Hwang
Abba Reporting
PO Box 223282
Chantilly, Virginia 20153
(518) 302-6772

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Call to order)

THE CLERK: This is civil cause for an oral argument by telephone, docket number 20-CV-1910. B.I. Infant by Father Arthur Iskhakov v. Chazaq Organization, USA, Inc. et al, Magistrate Judge Peggy Kuo presiding.

Will the parties please state their appearances, beginning with Plaintiffs?

MR. DRUYAN: Martin Druyan, attorney for the Infant B.I. Thank you.

MR. MILSTEIN: This is Daniel Milstein with the law firm Aaronson Rappaport Feinstein & Deutsch for the Defendants Commonpoint Queens, also known as Queen Central Y. Good afternoon, Your Honor.

MR. TOEWS: Good afternoon, Your Honor, you also have Mark Toews, T-O-E-W-S. I'm an attorney with the Office of the Corporation Counsel and I represent the City of New York. Good afternoon.

THE COURT: All right, good afternoon. Can you state your name again, please? I didn't catch it.

MR. TOEWS: Sure. This is Mark Toews. It's T-O-E-W-S.

THE COURT: Okay, and it's pronounced Toews [TAYS]?

MR. TOEWS: Yes, Your Honor.

THE COURT: Okay.

MR. TOEWS: Thank you.

THE COURT: All right, good afternoon, everyone. This is an oral argument on the motion to dismiss that Defendant's Commonpoint Queens and the City had filed. The complaint is quite long and has many different elements to it.

And the motion to dismiss also had several elements to it. And so, I'll give each side an opportunity to tell me more about their positions.

I did want to start with a couple of questions that I would like to have answered and I'll just pose them, so that you have an idea of the kind of things that I'm likely to ask you about.

So the first thing is about the motion to dismiss. I wanted to get my arms around the documents that I'm allowed to consider.

And then also, I would like to hear from the Defendants more about the -- I understand that some of the arguments are about the failure to allege specific facts. So I would like the Plaintiff at some point to point to specific facts in the complaint to address those.

Then as to the specific count, I saw that there's a first cause of action states a Title VII claim, but in the caption -- well, it's a long list of what appear to be statutes, but not entire -- it's not entirely clear what those numbers on it to be.

I see a Title VII claim. I see a reference to Title

1981. I see some regulations under the EEOC. So I would like to get some clarity on what claims are actually being alleged in that first action.

There was also a reference earlier in the Second Amended Complaint to Title IX on page 6. And it's not listed here. So it just wasn't clear why the title might have been asserted here as well.

So then, there is also some reference on page 10 to New York State here as well, but it's not brought up again as far as being one of the side causes of action. I had a question about that.

The third cause of action does say it's a New York City law, but I would like to understand specifically which law is being alleged here, because again, there are numbers that I could not figure out what they were in reference to. So I would like to have clarity on what the New York City claim is.

On the second cause of action, there are three laws being asserted there, Section 201(g) of the New York Labor law, New York State Executive Order 19, and Workforce Investment Act 1998, which I understand has been superseded by a different law.

I just don't have the exact acronym in 2014, but nevertheless, I wanted to understand what the -- where there is a private right to sue.

So I wanted to see if Plaintiffs can point out to me

where there's a private cause of action under those provisions.

And then, for the state common law claims, there are in the fourth cause of action, there's a long list of things, but there's nothing further that tells me more about those claims and the basis for them. So I would like to hear from the Plaintiff about those.

And then, on the fifth cause of action, retaliation, there's no statute listed there. So I don't know what the retaliation is for and on what basis and all the elements of retaliation. So that was not clear to me.

Then on page 21 of the complaint, there's the third-party beneficiary damages. I can't tell if it's just damages, and if so, what it is.

I also can't tell if it's a separate cause of action. It's not listed as such, but earlier in the Second Amended Complaint, there is on page 6 this reference to breach of contract and the -- between the Defendants and the Plaintiff being a third-party beneficiary.

So I just didn't understand what that reference was. I've been reading the complaint to be these five causes of action. And like I said, some of them are not even within them entirely clear what's being alleged.

So I know that's a lot, but I just wanted to start there. And then, I also have a lot of questions about who's the employer.

So I would like to know who is Saphirstein's employer and what's been alleged or not alleged and why those are Saphirstein's employer or employers.

And then, who is B.I.'s employer if at all -- if he is employed at all or whether he's an intern under cases like O'Connor.

And then, if he is an employee of someone, who is the former employer? And then, once you figure out who the formal employer is, then we can talk about whether there's a single employer that includes other people -- other entities and if there's a joint employer that involves other entities.

All right, so I figured I would give you an outline to the kinds of things that I have questions about, so that you can address them directly when you make your argument.

I may have more specific questions to ask as you go, but these are the areas where I have some -- where I could benefit from the party's input.

All right, so Mr. Toews, do you want to take -- do you want to start?

MR. TOEWS: Sure, thank you, Your Honor.

THE COURT: Or Mr. Milstein?

MR. TOEWS: Yeah.

THE COURT: I don't -- it's up to you whoever wants to.

MR. TOEWS: I'm happy to do either way.

THE COURT: Okay.

MR. TOEWS: And I'm playing an a little bit of catch up here. Ms. Glover withdrew from the case. She's no longer with our office, so I was Ms. Glover's supervisor.

So I'm familiar with the case. And I reviewed the motion papers. And I think I can I hope address the Court's questions.

Mr. Milstein, I don't want to volunteer him. I know he's involved with the case of a longer than I have, but if you prefer I start, but he might be in a better position to do so.

THE COURT: Okay, that's fine.

MR. MILSTEIN: I'm happy to do so.

THE COURT: Okay.

MR. MILSTEIN: And the Court's preference. Yeah.

THE COURT: All right.

MR. MILSTEIN: Okay, so my office represents Commonpoint Queens in this matter. The legal entity is currently Central Queens Y, but they're doing business as Central Queens Y at the time. And now, they go by Commonpoint Queens.

I don't think -- I am sure Your Honor is well aware of the facts underlying this case. And I think we can all agree that what happened to the infant, whether -- so alleged to have happened is horrific and has no place in any workplace.

But the general underlying point of my motion and of

I believe the case in general as it pertains to Commonpoint and to the remaining Defendants is that Commonpoint did not employ either Saphirstein or the infant.

Saphirstein, there's no dispute that he was employed by Chazaq in this case. I think at least when Chazaq was still in the case, they admitted employing him.

If you read through Plaintiff's opposition and through the discovery that had taken place before Commonpoint and the City were completed, there's never any dispute that Saphirstein was a Chazaq employee. So I believe that as a straightforward question.

The question of who employed the infant is more complicated. The setup was that Mr. -- the infant was a participant in a program, a City program, that was designed to find employment opportunities for teenagers.

As part of that program, the infant was referred to Commonpoint. And with -- through that program, he then would work at Chazaq.

He was -- he received payment from the City through the form of a I believe debit cards that he worked at the Chazaq work site. He was supervised everyday by Chazaq.

His job duties were set by Chazaq, his hours were set by Chazaq. Under federal case law, that makes clear that at the very least, Commonpoint was not the employer.

Case law in this district and I believe across the

country even made clear that it's a very holistic inquiry as to what an employer is, who the employer is.

But the general precedent, there has to be a substantial level of day-to-day control in this case. The only entity that had day-to-day control over the infant's activities was Chazaq. Since he worked at their work site, they told him what to do every day at least as per the complaint.

Mr. Druyan in his claim he incorporated by reference some documents that were provided in informal discovery. These documents included at the work site application, that is, employment application or his application to the FYDP Program that was sent to the City.

They also included the documents or the application that Chazaq filled out and sent to Commonpoint.

In that application, Chazaq says these are the duties that we will have our, I guess our interns, our individuals who work there for lack of a better term. These are the duties they will perform. These are the hours they will have. And these are even their supervisors.

Mr. Druyan has referred to those documents in the complaint. I believe that means you can incorporate those and you can refer to them when deciding this motion.

Those documents made clear that it was Chazaq who had the day-to-day control over the infant's activities. And there's no fact in any of those documents that allege that

Commonpoint had any control over them.

In fact, the only thing they show is that Commonpoint was not even aware of Saphirstein's involvement. He was not listed as a supervisor for Saphirstein.

So there was no way that Saphirstein's activities could at all be attributed to, related to, or even known about by Commonpoint.

As then as the infant was then not an employee of Commonpoint, I think the claim against Commonpoint must fail as the Plaintiff is alleging all of his actions are related to employment actions. There's an employment discrimination under Title VII, which is also time barred. We can come back to that.

There's negligent supervision. There's state human rights claims. There's City human rights claims.

But these -- those claims can only apply to employees. If the infant is not an employee of Commonpoint, there can be no claim for employment discrimination. He is not employed by Commonpoint, therefore, there can be no employment discrimination.

As to retaliation, the claim appears to be that after the events at issue in this case, Saphirstein then made an appearance at the infant's yeshiva. This caused understandable harm to the infant.

Those weren't sanctions or weren't even known about

their -- related to any way Commonpoint at all. Again, Commonpoint had no relationship with Saphirstein whatsoever. It's not alleged Commonpoint had any relationship with Saphirstein whatsoever. The retaliation claim cannot stand muster as it pertains to Commonpoint.

And lastly just to touch on the Title VII claims, the statute of limitations for a Title VII claim is 300 days. The incident occurred on July 9th, 2019. 300 days for that would have been -- I need to -- I lost what I had right in front of me.

That would have been early 2020 in any event. Even if you include the Covid statutory toll and that was applied to New York State law, he had already used the first 255 days of that 300-day statute of limitation before the Covid toll.

By the time the Covid toll was lifted, he would have been 45 days left and that would have expired December 18th. 2020. The suit was not brought until March of 2021 against Commonpoint, so the Title VII claims themselves are also time barred.

Thank you, Your Honor.

THE COURT: All right, thank you. And but you're counting the days till the EEOC, right, not --

MR. MILSTEIN: Yes.

THE COURT: Okay. Do you know --

MR. MILSTEIN: (Indiscernible) EEOC, yes.

THE COURT: Did you know -- when was the claim brought against Commonpoint and the EEOC (indiscernible)?

MR. MILSTEIN: Yeah, the right to sue letter was March 8th, 2021.

THE COURT: But we don't know when the claim was brought. Do you know you -- Commonpoint would have been notified at some point that the claim was brought, right?

MR. MILSTEIN: No, there was never a claim in the EEOC. I believe Plaintiff just obtained a right to sue letter from the EEOC --

THE COURT: I see.

MR. MILSTEIN: -- as opposed to pursuing a claim. Yeah.

THE COURT: Okay. Okay, got it, thank you.

So then, Mr. Toews, why don't you pick up --

MR. TOEWS: Thank you.

THE COURT: -- your part?

MR. TOEWS: Yes, Your Honor. So I think that was all well said by Mr. Milstein. And the City's motion is based on largely the same grounds.

Essentially, the crux of our argument in the motion is simply that we are two steps -- we, the City are two steps removed from any alleged misconduct by Saphirstein. We -- we're not the employer. We're not the employer of Saphirstein. Do not employ the infant B.I. either.

And so, for the reasons articulated by Mr. Milstein, that takes care of the bulk of the causes of action, which Your Honor noted are quite wide ranging.

So we have some other grounds for our motion as well, but I think the documents that were both attached to the complaint, which include documentation relating to the application and the agreement between Chazaq, which really here in our view, there's a responsible party in addition to Mr. Saphirstein would be Mr. Saphirstein's employer Chazaq, who's no longer in the case.

In addition, as we pointed out in our moving papers, it's also quite clear that documents relied upon by Plaintiff in drafting the Second Amended Complaint also make clear the relationship here, contractual relationship. There was a relationship between the City and Commonpoint, but not between Mr. Saphirstein or B.I.

And I think what we've tried to make clear in our papers is that the sole connection that Plaintiff seems to be latching on to was the simple fact of funding through this program.

And we think it's quite clear that the case law supports our position that remuneration alone is not sufficient to tie in the City to any alleged misconduct by this employee Chazaq.

The test is much more nuanced. The central factor

really bowls down to day-to-day control over the daily activities, the degree to which employer, here again Chazaq, does or does not have the ability to direct day-to-day responsibilities, work flow, determine the location, determine whether or not the employee is performing up to standards, potentially letting that person go if not.  And none of those additional factors I don't think suggest that the City has any liability as an employer.

We also moved on the grounds that for many of these causes of -- well, actually, before I go there, I think for much the same reasons, Plaintiff's state law claims also fail.

So with respect to negligence claims intentional -- infliction of emotional distress, supervision, *respondeat superior* does not apply here because again, none of the employment relationship factors are met.

Even if they were, the state law claims would not tie the City in because obviously, the law's clear that an action taken outside the scope of employment, which a sexual assault clearly is, not -- would not be related to any employment duties.  The City would nonetheless not be on the hook for any damages.

And as I began to say, we also moved on the grounds that many of the causes of action don't contain any private right of action.

I believe Your Honor may have mentioned this in the

lead up to the argument. The workplace -- excuse me, sorry. (Indiscernible) in advance of the Workforce Investment Act does not apply here. It's not a private right of action. The law's quite clear as far as that goes.

The retaliation claims, again, these as Mr. Milstein mentioned entirely speculative. This is not a -- the Department of Education is not a Defendant for the simple reason that the yeshiva -- that the Plaintiff attended is not a Department of Education school. It's a private institution.

So the City had nothing to do with that decision. And the idea that there was -- the expulsion as I understand it was retaliatory, they're simply not facts alleged that plausibly suggest that there was any connection.

Even if the City had been involved or the Department of Education had been involved, which they weren't, there's not sufficient facts here alleged that there was a retaliatory motive and there's no reason for believe that there was one in our view. So those are the (indiscernible) motion.

I think just to get back to what I think I already explained, but just to try and address Your Honor's question concerning, you know, what documents the Court might consider, I think all of the documents that we referenced in our motion both those that were attached to the complaint, which I think there's no doubt that those are under proper consideration by the Court on a motion, but also those documents that were

provided to Plaintiff's counsel and what I understand by Ms. Cook (phonetic), who's again no longer with our office, but through some informal documents through discovery prior to motion practice, those two are obviously relied upon.

And they're central to the allegations in the complaint, which you know, contracting has to be considered by the Court or certainly can be considered by the Court.

And I think the actual language of the contract and the other documents that were attached to the complaint made clear that not only were there no employer-employee relationship with the Defendant City, but a variety of other claims that the Plaintiff alleges to try and tie the City into this misconduct are actually expressly barred by the contract, so the contract makes it very clear in fact that the contract, which was between the City and Commonpoint specifically state that nothing contained within it creates any contractual relationship between GYCD, Department of Youth, and the work site sponsor for the participants.

So again here, the salient relationship here at issue is between the employer Chazaq and Saphirstein, who allegedly committed the misconduct. So that's -- those are the basic outlines of Defendant City's motion.

THE COURT: All right, thank you. I had a somewhat specific question, Mr. Toews. In the email that Ms. Cook sent on September 15th that attached documents, which everybody

seems to think I should be looking at in deciding this motion, there's a reference at the bottom of the third paragraph to what constituted a contract between Chazaq and Commonpoint, I think. And she says this contract took the form of work site application that's attached.

MR. TOEWS: Right.

THE COURT: Coupled with the work site clarification and assurances. And then she says GYCD does not have a copy of such. Commonpoint in fact should have copies of such.

And so, I wasn't sure if there was a missing document. There's a document that was attached to the Second Amended Complaint itself. It's page 4. It's listed as Exhibit 3, but it's page 4 of what was filed on the ECF. It's 49-2 and it says -- it's called Chazaq 2019 work site assurance and certification agreement.

But I -- it just wasn't clear because Ms. Cook seems to say there that the City does not have a copy of that contract or that last piece of the contract.

But it was attached to the Second Amended Complaint, so I see it, but I wasn't sure if she was referring to a different document.

MR. TOEWS: Okay.

THE COURT: And maybe I should ask Mr. Milstein since he's here.

MR. TOEWS: Okay.

THE COURT: (Indiscernible) so.

MR. MILSTEIN: Yeah, I believe -- yeah, I believe you're referring to the document that she was referring to. I think it wasn't in the copy that wasn't in there file at the time.

But it was in my file and I provided it to Plaintiff's counsel. And that was included as an exhibit Second Amended Complaint, so I believe it is --

THE COURT: Okay.

MR. MILSTEIN: You can consider it.

THE COURT: Okay. All right, I just wanted to circle around that make sure that --

MR. MILSTEIN: Yeah.

THE COURT: -- as I -- that the parties have the document and that I also have the document.

So, Mr. Milstein, since you're on the line, let me just make sure the documents that were attached to Second Amend Complaint as I see it is the Chazaq work site application, the Chazaq pre-assessment report 2019, and then the Chazaq 2019 work site assurance and certification agreement. That constitutes the Chazaq Commonpoint contract?

MR. MILSTEIN: Yes.

THE COURT: Okay. And then --

MR. MILSTEIN: I don't even know if -- I'm not sure I would classify the contract as with the --

THE COURT: Okay.

MR. MILSTEIN: -- that is what Commonpoint, yeah, submitted to Chazaq to participate in the program or the other way around, Chazaq submitted to Commonpoint.

THE COURT: Yes, okay.

MR. MILSTEIN: Yeah.

THE COURT: And then, Mr. Toews, the comments that the contractor that the City had with Commonpoint was the Exhibit B that was attached to the motion, which was referenced in this Court's email, right? So I see Exhibit B and it's dated March 11, 2019?

MR. TOEWS: Correct, correct, yes --

THE COURT: That's (indiscernible) point?

MR. TOEWS: Yes. Document 53-2, yes, that's the contract he's referring to.

THE COURT: Oh, okay. The entirety of the contract. Okay.

MR. TOEWS: Yes.

THE COURT: Great, so let me ask both of Defense counsel, if -- so if the payment is coming from the City, and everybody seems to say that that's what happened here, how is Chazaq the formal employer since Chazaq is not paying?

And isn't that a requirement that there be an employer or is there no employer? Is the -- is B.I. an intern as most of the cases seem to describe unpaid people?

MR. MILSTEIN: It -- under the case law, the --

THE COURT: Is this Mr. Milstein?

MR. MILSTEIN: Yes, this is Daniel Milstein, I'm sorry.

THE COURT: Okay.

MR. MILSTEIN: Yes, under the case law, the determination for an employer as Mr. Toews I think eloquently put it's a very nuanced inquiry. And the key things to look at is who has the day-to-day control.

THE COURT: Uh-huh, but for formal employer, I understood there's a lot of --

MR. MILSTEIN: Yes.

THE COURT: -- cases that say you're not an employer at all if you don't pay. So can you address that?

MR. MILSTEIN: My position as far as Commonpoint would be is simply that Commonpoint did not employ the infant for that precise reason because not only --

THE COURT: Okay.

MR. MILSTEIN: -- was there no data control, but there was no payment. And there was no substantial benefit whatsoever.

There's case law that says that there can be some nonfinancial remuneration that could apply. There's also case law that says that specifically, something like experience, something like the opportunity to showcase yourself, that does

not count as a substantial benefit to make an entity an employer and the -- some of these things I can count are things health benefits, retirement benefits.

THE COURT: Uh-huh.

MR. MILSTEIN: Here, Commonpoint has done next to -- has offered very little remuneration in simply helping him gain work experience, which under case law, he operates Citizens for (indiscernible) case, for example, where they say explicitly that just work experience in and of itself isn't sufficient to make it and to be an employer.

THE COURT: Uh-huh, so from your perspective, it doesn't matter if Chazaq is a formal employer or not an employer either? You're just saying Commonpoint --

MR. MILSTEIN: Yeah.

THE COURT: -- doesn't have enough nexus --

MR. MILSTEIN: Right.

THE COURT: -- through payment and through control to constitute an employer?

MR. MILSTEIN: Yes.

THE COURT: Okay.

MR. TOEWS: And Your Honor --

THE COURT: And Mr. Toews, I'd like to hear from you, since the City is paying.

MR. TOEWS: Right.

THE COURT: So they're saying payment enough is not

enough -- payment alone is not enough, you need control.

So does the program setting up the rules and the parameters of the program, you're saying don't constitute control?

MR. TOEWS: Correct, Your Honor, and that's obviously we are in this respect in a different position than Commonpoint, because the money came from the City.

However, I think we do take more or less the same position with respect to the question that Your Honor posed about, you know, was Chazaq the employer or was B.I. an intern?

And to be frank, I don't know the answer to that question. I'm not sure I can -- we didn't address it in the papers at least explicitly, but I think we take the same position legally, which is that respectfully, it doesn't matter because what we are arguing is simply -- it definitely wasn't the City.

I mean, Chazaq, you know, because they're not -- no longer in the case, that may have been an argument for them, which they're not here to make.

But in any event, we take the position simply that just the money is not enough and that the courts have said there's this 13-part test.

And some of those factors don't necessarily apply here, but the Court made clear in Reed, I think, and other cases, Gulino, that no one factor's determinative, but that

courts place the greatest emphasis on the extent to which the party maintains, you know, the manner and means by which the worker completes the assigned day-to-day tasks in addition to, you know, the content of the work product, the skills required to succeed, the provision of quote instrumentalities and tools, the location, the designation of the location of the work.

So our position is simply that whether or not he was Chazaq's employee doesn't matter because as far as we're concerned, it's clear that the City was not.

THE COURT: Uh-huh. And so, even though the City has things in its program rules such as the -- a person cannot work more than 25 hours per week, that's not controlling his hours?

MR. TOEWS: We take the position that it's not enough. That if you take -- look at the totality of both what's alleged in the complaint and the documents that were attached, it's clear that we weren't supervising this person.

I mean, and again, I think we were -- as I say two levels removed. So even a level further removed than Commonpoint.

So I acknowledge that the money, we -- you know, we don't dispute that the money came from the City. That said, still when you look at the documents would show who the person's supervisor was, where they were supposed to work, what they were supposed to do, I don't think the general program guidelines are enough when it comes to determining whether or

not there is an employer-employee relationship.

MR. MILSTEIN: And this is Daniel Milstein --

THE COURT: I --

MR. MILSTEIN: Sorry.

THE COURT: Yes, no, go ahead.

MR. MILSTEIN: Yeah, it's just to -- you know, just to add to what Mr. Toews was discussing, the Gulino case that he referenced, it's 460 F.3d 361 to a 2nd Circuit case from 2006, they say that just a level of control over the curriculum and credentialing requirements is not enough to make an entity an employer.

That does seem to be almost directly on point to this specific discrete inquiry over whether any control over the hours alone just saying 20 -- a basic level of control would not be sufficient.

THE COURT: Uh-huh, okay. All right, so let me turn now to Mr. Druyan.

MR. DRUYAN: Yes, thank you, Your Honor.

THE COURT: (Indiscernible.)

MR. DRUYAN: Yes, thank you for your courtesies. And it is Plaintiff's --

THE COURT: Can you first clarify -- I'm sorry, can you first clarify the complaint itself because I had a lot of questions as I outlined at the beginning as to what exactly you're alleging. So that might be a good starting point.

Because if you're -- if there's certain things that you're not alleging, that we'll take those across the table for my consideration, but if you are alleging it, then I will have questions as to what facts you're alleging to support those claims. So can you start there?

MR. DRUYAN: Certainly, yes, and basically, we're alleging the Title VII, U.S. Code 42 Civil Rights Act --

THE COURT: Uh-huh. Okay.

MR. DRUYAN: -- and the related laws and sections that prohibit sex harassment.

THE COURT: Okay.

MR. DRUYAN: Because what happened here was sex harassment. And that all the law --

THE COURT: So basically that he's male, that B.I. is male.

MR. DRUYAN: And yes, and that the physical contact was sexual in nature and --

THE COURT: Right, Title VII always requires that it's based on some differentiation, some protected class. And so for here, I'm just trying to be clear that you're saying that B.I. was a member of a protected class of being male (indiscernible).

MR. DRUYAN: Either male or infant.

THE COURT: Well, infant is not a protected class, so that's why I'm trying to be very clear about it.

MR. DRUYAN: Okay, he was -- and there's a religious component to this whole situation whether --

THE COURT: Right, but I don't know how the -- you've mentioned religion in your complaint, but I don't see the facts as to why the sexual touching had anything to do with being treated -- harassment or discrimination based on religion.

MR. DRUYAN: Well, backing up, the facts, it is our position that pursuant to Reed, that all the Defendants were the employer.

And they all shared control pursuant to the contracts and they divided and devised this contractual relationship between them that worked to all of their benefit.

And that the contracts were not theoretical in nature, but that the Court should recognize that each of the parties transferred, you know, significant amounts of money to each other and that the shared nature of the -- and control of the infant student intern was common to all Defendants.

Now from that, we allege that the child was in a protected class as an infant and that starting with the City, the City takes a youth -- an infant and as the youth/infant fill out an application.

Religion was a part of this that the Jewishness led to the reference to Commonpoint, which is a Jewish religious charitable organization. And that the contract was then with Chazaq, another religious charitable organization. Chazaq is

out of the case.

So what the Defendants in arguing, and as Your Honor correctly noted, it's confusing. And we ask who is the employer? Was the youth an intern?

My understanding is from the case law that the interns are not being paid. It is our position that payment, he was an employee.

And I believe in the contracts, it's about summer employment. And so, the City is paying. And they refer pursuant to contracts paying Commonpoint to then refer the infant to another employer, which is Chazaq.

The contracts between them create the shared responsibility to the infant that the employment will be beneficial and it is work.

And there is training involved beyond mere intern work, which is one less showing yourself, you know, learning by, you know, observing, but here, actual physical work.

Now it is our position that the shared control and looking at the Reed case, and I believe all the case law is that it is a case-by-case examination and a flexible standard.

And I submit to you that this contractual relationship of the Defendants should not create a situation under law where, well, it was so many of us, so therefore, it's opaque and none of us are responsible.

And in fact, moving into the statute of limitation

argument, which I find particularly disappointing because the infant in fact didn't know who he was working for.

The infant was getting paid by the City. He did submit the application to the City. There -- the application went to Commonpoint, a Jewish organization.

He then sent over to Chazaq, which is another Jewish organization, where he's doing the physical work under the supervision of Mr. Saphirstein.

Pursuant to the contracts between the Defendants, which are supposed to benefit the child because this is a government function really to educate children and summer employment programs to help youths, children.

And the only way that we found out who is who among the Defendants was during discovery after we knew Chazaq. And then reluctantly, we found out about Commonpoint after we went to a conference and I was demanding documents.

So for Commonpoint to be rewarded by secreting its identity as an employer and not giving the child, you know, a letter that says we are due here and you did this for us, they hid their identity in this contractual situation where they're profiting by millions of dollars.

And ultimately, the infant is harmed. So that all of the case law and every concept of fairness and equity if Defendants can seal their identity from a child and we didn't learn of their identity except through the litigation process

and discovery, and then, we moved expeditiously to add them in.

And the EEOC, you know, based on this fact pattern of hiding their identity by, you know, really subterfuge should not be rewarded by saying, well, that counts as a statute of limitations defense really given this type of subterfuge, which really borders on fraud, it should not constitute the Plaintiff infant missing the statute of limitations.

And another concept is that, you know, the statute of limitations would toll for an infant. And that's an additional argument so --

THE COURT: Mr. Druyan, you keep -- can I just pause for a moment because you keep saying the infant, but I assume that all of these actions are being taken on his behalf by adults, right?

So the infant is not being told he has to go do all this work. His father came forward and has been bringing all these actions on his behalf, correct?

MR. DRUYAN: That's correct, but the --

THE COURT: Okay.

MR. DRUYAN: -- victim and the legal entity when the case was filed and when the wrongs accrued was to the infant.

THE COURT: Yes.

MR. DRUYAN: I mean, the father was never employed, yeah.

THE COURT: That's I just want to be clear because

you keep saying that. And so, I just wanted to be clear.

MR. DRUYAN: Well, because --

THE COURT: And then also, can I go back to your religious -- you keep bringing up religion and that these are Jewish organizations.

But I'm having a hard time because you've wandered away from my original question, which was what claims are you bringing?

And it does not sound like that a Title VII is based on religion because the misconduct alleged by Saphirstein was based on sex, the sexual harassment, the sexual touching of the infant's genitals.

And so, that seems to be, based on the -- your -- the Plaintiff being a member of a protected class of being male, right?

Title VII has sex, race, religion, national origin as protected classes. And you can't discriminate on the basis of those protected classes. You can't discriminate.

Not just take action, but you can't discriminate. And so, there has to be some basis. I'm just -- you didn't say it. So I'm just trying to read into it and infer what you're meaning to say.

And based on the factual allegations, I'm inferring that you're saying that Title VII was violated because your client was male and that he was subjected to sexual harassment

that is sexual touching on the basis of his sex. Is that a fair summary of what you're alleging?

MR. DRUYAN: Yes, that's fair. And I appreciate --

THE COURT: Okay.

MR. DRUYAN: -- your perspective and assistance on that, Judge.

But I would say that in -- to have the infant victim be able to assert his claim, and I listed all the claims, you know, that we could think of.

THE COURT: So that's the other thing, Mr. Druyan. I appreciate those are the things you could think of, but it's not clear to me reading it what you mean.

So my question was I've identified Title VII. You've named it and you've asserted facts that seem to say that, but you also say Section 1981, which is another claim, interference of contracts is on racial grounds.

I don't know if you just put that in there or you actually meant to bring that claim. Is there a 1983 claim -- 1981 claim here that you're asserting?

MR. DRUYAN: Well, to the extent that --

THE COURT: It's a Title -- Mr. Druyan, I can't you can't to the extent that and make me do the work. So I'm trying to figure out your first action appears to be Title VII.

All that other stuff, I don't know if it's -- I can't make sense of it. So I don't understand what is being

asserted.

So I'm just trying to lay out to you. I would normally be doing this with a pro se litigant and you're a lawyer. So I'm just trying to be clear what you're saying.

So I see Title VII. I don't see Title IX or as you called it Title X on page 6 of the complaint.

MR. DRUYAN: Yeah.

THE COURT: So I'm assuming that you're not asserting Title IX.

MR. DRUYAN: Correct.

THE COURT: Is that right? Okay, so first cause of action is Title VII?

MR. DRUYAN: Yes.

THE COURT: The harassment under -- as a component of sexual discrimination, sex discrimination, correct?

MR. DRUYAN: Yes, Your Honor, thank you.

THE COURT: Okay. That clarifies things for me, so thank you. I appreciate that.

So is there a New York State human rights claim? It is not one of the five causes of action, but you say something about it elsewhere in the complaint. If you're not asserting it, that's fine. It makes it easier for me for understand.

So is there -- I don't see a specific New York State human rights law claim here. Am I right about that?

MR. DRUYAN: Well, if I mentioned it later in the

complaint, if I survive the motion to dismiss, we would be willing and request to amend to include a New York State human rights claim.

THE COURT: Well, but I don't -- I'm not here to create claims for you. And again, you're a lawyer. So you did not assert it here. I'm just trying to make sure I didn't miss something. Right, so I don't see it here.

MR. DRUYAN: I served it and I've waived it. And it's gone. And then, that will be it, Judge, thank you.

THE COURT: Okay all right, great. That is very helpful, thank you.

And so, let's talk about Title VII. Let's go ahead and talk about the employers. Who was Mr. Saphirstein's employer?

MR. DRUYAN: Clearly, it's Chazaq, who's out of the case.

THE COURT: Okay. And so, if he is employed only by Chazaq, then how are his actions attributable to the City or to Commonpoint notwithstanding even if the City and Commonpoint were the infant employers, how are the actions of a nonemployer attributable to these Defendants?

MR. DRUYAN: Because of the contractual relationship of these Defendants and the duty owed to the infant.

THE COURT: Okay, and I understand what you're saying because as human beings, we all want adults to take care of

children.

But under the law, especially when you've brought in employment discrimination case, there's specific things that have to be -- elements that have to be met.

And so, if an infant is at a workplace, okay, and somebody abuses him, but it's not his employer because he's employed by someone else, then how is there liability to other entities of actions by someone else, right?

MR. DRUYAN: Well, one --

THE COURT: The employment discrimination law is meant to protect against discrimination actions taken by the employer.

And then, you hold the employer accountable for it, but here, if Saphirstein is not employed by the City or by Commonpoint, how are his actions attributable to those entities, even if those entities employed B.I.? I just want to start there. What is -- you haven't cited any cases that tell me that this is okay, so.

MR. DRUYAN: It would seem that as we look at the facts, and we could -- we find that Saphirstein is, yes, the immediate employee of Chazaq, but I submit to you that it's the City's money to Commonpoint, and Commonpoint's money to Chazaq that under the concept of Reed, joint employment, common employment control of subsidiaries by the City by paying the money but for the contracts, I submit to you Saphirstein would

not have been a paid employee of Chazaq. And the infant would not have been a paid employee at Chazaq.

That it is the City's money and the contracts between the Defendants that create their liability, which goes beyond a general concept of adults taking care of children.

But here, the Government in a Government function, subcontracting with two employment entities, creating an umbrella of shared responsibility and obligation to the infant as evidenced by the detailed contracts that you noted were attached to the motion papers and to the complaint.

So that but for the City and Commonpoint receiving the money and having the contracts and sending the child to work at Chazaq with Saphirstein, who's -- you know, we could say he was immediately employed by Chazaq, but as we step back from the mountain and try to look at the top of the mountain, again, but for the money and the contracts, Saphirstein would not have been working at Saphirstein and neither would B.I.

And in fact --

THE COURT: What control over Saphirstein's work did Commonpoint or the City have because money's not enough? There has to be control.

MR. DRUYAN: It's pursuant to the contracts, which detail the work of each entity in this summer program.

The control of Saphirstein and his being vetted and warned and trained and steps should have been taken to prevent

him from doing what he did, including taking the infant child off premises to his motor vehicle as part of the work, these contracts were designed and reading them that these programs for which these Defendants were paid were contractually to educate and protect the infant.

And it's the breach of that contractual duty for which they received payment, which creates the liability and the duty towards the infant as joint employers, shared employers, common employers. And it's with -- and that's it. And it all --

THE COURT: Okay. Can --

MR. DRUYAN: Yes.

THE COURT: Okay, look, can you address the O'Connor case as well as other cases that talk about this -- if -- even if you're being paid, if you're being paid by the separate entity that you could still be an infant.

Leopold (phonetic) is another case. O'Connor and Leopold. Both involve -- one is a trainee and one is an intern, where the individual goes to work at a particular work site, is not paid by that particular work site, but receives money from the school or some other, you know, program, that person receives funding.

And the courts in those two cases say the individual is not an employee of that work site, because the funds are coming from somewhere else.

So isn't B.I. an intern?

MR. DRUYAN: No, Your Honor, respectfully, I would say this is in the nature of an employment agency, where the City, beyond paying, took an application and read the application, and evaluated the infant for reference to Commonpoint as a Jewish charity. And it is the reference and evaluation of this infant as suitable to work at Commonpoint.

And then, Commonpoint does the same evaluation pursuant to contract for which it is paid and says you, infant B.I., you're an employee qualified and referenced over to Chazaq.

So it's more than just spending money. It's this analysis by the City that the infant is suitable, and is qualified, and is referenced over to these other Defendants.

So, again, as the Reed case and, you know, I tried to express this in my opposition to the motion, it's more than mere funding.

Here, the reference and the evaluation and the contractual supervision of both the infant and the programs create the employer liability that Plaintiff says exists.

THE COURT: Uh-huh, okay. And so, since we're talking about Reed, why don't you run through all of those factors and let's -- tell me -- you can tell me what -- how Commonpoint and the City are a part of the control?

So we've talked about the pay. Although you said the

money was flowing from the City to Commonpoint to Chazaq, but my understanding is that the City paid -- provides the money that went directly to B.I.

And that the money that went to Chazaq -- sorry, that went to Commonpoint and the City was a contract for Commonpoint's services, right?

So Commonpoint is providing staff to administer the program. And so, that's what the City is paying Commonpoint to do and the training program.

But I didn't see that money was going to Mr. Chazaq at all. Did you -- where do you -- is there any evidence of that or any allegation that money went to Chazaq?

MR. DRUYAN: Well, yes, my -- upon information and belief, none of these Defendants are volunteers. They're not --

THE COURT: All right, but why --

MR. DRUYAN: -- doing this.

THE COURT: Yeah, I understand that, but why wouldn't Chazaq be -- you said it's a not for profit Jewish organization.

Why wouldn't it just be funded separately for the good work that they're doing in the community? Why would Commonpoint be paying Chazaq?

MR. DRUYAN: Commonpoint is paying Chazaq because on one level, they're doing community service by this program, but

on another level, they are getting City funds for this program for their organizations.

It's beyond a general funding. These contracts were program specific. And they were funded for this program.

And this -- you know, many years ago, infants worked directly for the City in programs like in the Parks Department say 30, 40 years ago.

But over the years, the funding of the City, moved to community-based programs to do this government function. So that what, you know, 50 years ago, you know, I myself participated in Parks Department summer youth programs, but now, the programs and youth employment go over to the private sector charitable organizations.

So that these organizations, I submit, are specifically funded for this program pursuant to those contracts, not pursuant -- they may get additional money for community affairs.

But our action, bringing it back to the infant's action is based on these contracts and the breaches of these Defendants of their responsibility to this infant collectively and the fact that at this point, it is sort of opaque. And as Your Honor, and I say respectfully and astutely said, well, who is the employer?

But if these Defendants create this system of, well, you don't know who the employer is, you know, you have to sue

and litigate to find out, but this is a system that they created.

And then, as Your Honor said, you know, adults take care of children. It's a government function, you know, that the government takes care of children who are, you know, generally a ward of the Court.

THE COURT: Well, hold on. Let me just clarify. I did not say it's the government's job to do that. I said at a human level, that's what we want. But from a legal perspective, what you're talking about is employment law, okay?

So I -- you -- your argument keeps shifting into protecting the infant. And I totally understand why you would want to protect the infant.

But employment law is very, very specific. And federal employment law is very specific and has specific hurdles that Plaintiff has to get past, including who's the employer.

And sometimes the answer is there is no employer, right? So it doesn't mean that every time someone is harmed, that there's a remedy for it.

It doesn't mean that every time somebody is harmed at a place where they are -- I'm going to put in air quotes working because I don't know if it's a legal definition of employment or something else, if they're harmed where they're working that somehow it falls under Title VII of a federal law,

which -- a civil rights law, which says that it protects people in the workplace as a component of employment law.

So I am just -- it's a complicated area, but I don't want you -- and I had to stop you there because you seem to be saying that I was saying particular things. And I'm not.

MR. DRUYAN: Well --

THE COURT: I'm not saying that there is an obligation under the claims that you've brought for the government to do certain things with regard to infants. That may be a whole other area of law, but we're only talking about employment law.

So for purposes of employment law, we do have to identify who is the employer, who is the employee. And sometimes like I said, in some of these cases, the answer is there is none.

And it doesn't make it nefarious. It just means that under the -- the way the law is structured, there is no employer to be held responsible under Title VII for discrimination under the circumstances.

There may well be other claims. There may be other things that are happening, but under Title VII, that may end up being where things end up. It happens. I've seen it happen in many of the cases.

So that's why I'm exploring this issue with you, Mr. Druyan, all right? Just wanted to clarify that.

MR. DRUYAN: Yes. Now in the complaint, I did in the third cause of action cite New York City Title 18 administrative code local law prohibiting employer sexual harassment of employees.

It was our position throughout and, you know, I'm sure you've heard it many times from me. And I appreciate your patience with me that they were all the employer that sometimes there is no employer.

But here, we submit, based on all of these facts alleged and all the contracts, that they are all the employer. And that is Plaintiff's position.

And we also say that under a related action that is appended to the federal action, we do have the New York City Administrative Code and that they're liable under that Code.

THE COURT: Uh-huh.

MR. DRUYAN: And then --

THE COURT: I see that, yeah.

MR. DRUYAN: And then, under the fourth cause of action, and I apologize, I don't want to interrupt, Your Honor, it says that we have common law state actions for assault, battery, negligence, *prima facie* tort, sexual tort, unlawful touching, failure to supervise employees.

And that these appended state law claims are, you know, properly appended to the federal claim. The federal court has jurisdiction to hear them in this context.

And that these claims we respectfully argue should be viable against these Defendants as joint employers pursuant to the contract and pursuant to the facts.

THE COURT: Uh-huh. And Mr. Druyan, you certainly have the right to bring state claims here, but you still have to allege the components of it.

And so, for example, for negligence, what kind of negligence are you talking about here?

MR. DRUYAN: The negligence is as the facts in the portion that the Defendants failed to vett and supervise and enforce their own contractual obligations, among them, each other, upon which they received funding, so as to take steps to prevent and supervise Saphirstein from taking the infant off premises, and you know, touching him.

And I submit to you that had they properly supervised Saphirstein, had they properly vetted Saphirstein, had they properly been nonnegligent with their duty owed to the infant as an employee, and even as an intern if Your Honor decides he's an intern, or as a referenced person because I submit to you that when he went to the City and filled out an application, the City owed him a duty and that he went to Commonpoint and had interaction with Commonpoint.

Commonpoint owed him these common law duties and that they then sent him over to Chazaq, where this incidence occur and that they failed as I say in paragraph 14 of the complaint,

to take all necessary steps to avoid and prevent the sexual assault described herein.

And these are now in the realm of, you know, common laws, New York state claims --

THE COURT: Uh-huh.

MR. DRUYAN: -- and if I haven't pleaded them with enough specificity, I apologize. I asked that I be given another chance, do another amended complaint to plead the negligence and state law claims and even the City sex harassment claim with greater detail.

But from Plaintiff's point of view, however, inarticulate I was in this complaint, again, you've heard it and you know it. This infant was harmed by the negligence and failure to supervise.

And in fact, is a third-party beneficiary of these contracts. And that's another concept because these contracts, you know, without the infant, these programs wouldn't have been funded. These contracts needed the infant Plaintiff to be referred in this manner.

Without infants, these Defendants would not have had a program. If there were no infants, there'd be no program. If there was no program, there'd be no funding.

So the infant from our perspective was a third-party beneficiary. And notwithstanding the contracts could deny it, you know, it's the actual facts that have to be looked at.

And you know, Plaintiff didn't create these facts. These are the facts, you know, that exist.

THE COURT: I'm sorry, sorry to interrupt you. I think the factual incident you've alleged, and I don't know that anybody has contradicted you at this point as to what happened with Mr. Saphirstein, but the -- I -- let me try to understand what you're saying with the third party beneficiary.

You're saying that the Plaintiff is a third-party beneficiary of the party of the contracts even though the contracts don't say that?

MR. DRUYAN: Well, the contracts deny like a liability and they put language in you know, that we're not liable, but it's not binding on the infant.

THE COURT: Uh-huh.

MR. DRUYAN: You know, say -- when you get into negligence principles, you know, sometimes people buy a ticket to enter, you know, a premises or, you know, a sporting activity.

And back of the ticket may say you know, we're not liable no matter what happens. But it -- pursuant to negligence concepts, you know, that type of liability and that denial and that type of exculpatory language in contracts is not necessarily binding on the infant.

THE COURT: Right, because it's two different areas of law. One is contract law and the other is tort law. So if

you're not a party to the contract, you can't seek to enforce the contract. And you can't seek the benefit from the contract.

And even if you did, you would be limited to what the contract said.

But the other part of it, like you said, is that there may be obligations outside the contract such that the contract can't mean that you don't have the -- a tort objection. Is that what you're saying?

MR. DRUYAN: Yes, but I'm -- respectfully and I apologize and I'm trying to express it. I would say the duty runs both that there is the infant as a direct third-party beneficiary of these contracts.

THE COURT: Okay.

MR. DRUYAN: Notwithstanding.

THE COURT: Can I stop you there?

MR. DRUYAN: Sure.

THE COURT: I need to stop you there.

MR. DRUYAN: Thank you.

THE COURT: The contract doesn't say that. You're just saying that that's what it is, even though the contract doesn't say that, right?

MR. DRUYAN: Well, during Defendant's argument, I heard the Defendant say, well, the contracts say and I believe in the motion papers, the contracts says, well, we're not

liable I believe they said it to the infant participants.

I mean, I -- I don't have the --

THE COURT: I understand that, but this is what I'm saying that you're -- I heard you saying and I understand this, that the contract cannot disclaim any obligations that would exist regardless of the contract, right?

But I'm -- when you say you're a third-party beneficiary of the contract, normally, it means that you're not a party of the contract -- to the contract, but the contract specifically says you, third-party, you still are a benefit here, even though we -- you're not part of this contract.

And usually, I think, or maybe always because the contract says that. The contract makes reference to you as a third party and the benefits that you're getting pursuant to the contract, even though you're not party to -- a party to the contract.

So that's my understanding of what it means to be a third-party beneficiary. So you're saying something different. And I haven't heard any case law that supports that. So I'm just wondering what exactly you're trying to say, but --

MR. DRUYAN: One --

THE COURT: -- I'm hearing you say it's a tort action that a contract cannot contract out an obligation under tort. Is that right?

MR. DRUYAN: Under tort. And I would say under the

contract itself, while it may -- and I would if there's, you know, if this is not clear, maybe we could be given time to brief it, but you have -- certainly the Defendants are contract participants with each other.

And it is our position that the third-party infant under particular limited circumstances while we don't have privity to the contract, we have certain rights to enforce the obligations contained in the contract.

And the obligations that were in the contract are proper supervision and a safe workplace are the concept of being a third party beneficiary that those obligations that are -- I'm repeating in the contract between the City and Commonpoint, between Commonpoint and Chazaq for which they got the monetary consideration of having a safe place to work for infants that the third-party beneficiary concept the infant can enforce the breach of that contractual obligation because Saphirstein molested the child and they're all jointly employers.

And they're all contracted with each other, hence, they're all liable to the infant as the infant seeks to enforce the specific contractual obligations contained in the contracts that are before the Court.

THE COURT: All right, and in the Second Amended Complaint, that is not a sixth cause of action? It's just listed there under damages, so that is not a separate cause of

action that you've claimed in the Second Amended Complaint?

MR. DRUYAN: I would submit to you that the complaint is, you know, clearly not perfect, but I would submit to you under the federal rules with all of the time and argument that you've generously given us, that you could permit me to amend the complaint. And given all that has transpired there's been no prejudice to these Defendants because these facts are, you know, fairly concrete.

It's -- the facts are not really in dispute. It's really the interpretation of the facts. And in sum, I'd say I mentioned it. I didn't elaborate, but it is there.

And I would beg to be permitted to amend the complaint again in fairness. That's our position, thank you.

THE COURT: All right, and then for -- one of the things just looking at the re-factors, who interviewed the infant before he was placed which of them?

MR. DRUYAN: Apparently, as the Defendant seemed to admit, they all interviewed him because he goes --

THE COURT: How does that --

MR. DRUYAN: Well, he goes through the City, he fills out the employment form. They then send him to the contracted Commonpoint. They evaluate him.

Jewishness seems to be a part of this. And they say, okay, you qualify for --

THE COURT: Mr. Druyan, you keep saying that. And

I'm so puzzled by why the Jewishness has any role in this case other than that the police organizations have an affiliation with that.

You've not alleged discrimination. I --

MR. DRUYAN: Well --

THE COURT: I don't know, but --

MR. DRUYAN: Well, let me try to explain.

THE COURT: I give you.

MR. DRUYAN: Well, I -- and again, I am not --I apologize for not being perfectly articulate, but I would say this.

It's not a coincidence that B.I. came from a yeshiva from the yeshiva, which is a Jewish school, to the City which interviews him, and has the long interview document, they evaluate and analyze him.

Coming from a yeshiva, it's not an accident they didn't send him to, you know, the Presbyterian black church in downtown Brooklyn near the courthouse with Reverend Daughtry, Which may have a similar program.

I submit to you that it's apparent that there was a Jewish aspect to the references here.

Now it may not be explicitly stated, but I think it's clear and apparent that from the City taking the yeshiva boy as they call him, and send him to the Jewish Commonpoint, and then send him to the Jewish Chazaq, that being Jewish was an element

of this particular reference, even though, you know, there's no question perhaps that says are you Jewish, but they knew he was Jewish because he came from the Jewish yeshiva, so --

THE COURT: So can I go back to this question about the interview? You said there was a long interview document. And there's an evaluation. Was there an actual face-to-face interview or was it --

MR. DRUYAN: My understanding is there -- respectfully and I don't want to interrupt.

THE COURT: Uh-huh.

MR. DRUYAN: And I thank you for your patience, Judge, again, I understand that this child was interviewed by each of these Defendants. That it was not merely, you know, an Internet interview, that he was in-person interviewed.

And I believe he visited all of these Defendants in person. And I submit to you that's why, you know, this whole thing is so confusing.

Because he went from place to place not knowing, you know, who's who and what's what.

THE COURT: So he wasn't (indiscernible) Commonpoint?

MR. DRUYAN: He didn't create -- excuse me?

THE COURT: You said he was interviewed by the City.

MR. DRUYAN: My understanding is that he went to Commonpoint and was interviewed by them, yes.

THE COURT: By Commonpoint?

MR. DRUYAN: Yes, because I believe that pursuant to the contracts, and their role in the receipt of money, and their role in this program, that they had an obligation to interview him in person.

THE COURT: Uh-huh.

MR. DRUYAN: And that they did. And then --

THE COURT: But not -- can I just -- I'm sorry, because I'm just trying to clarify. But not separately by the City? Just through Commonpoint?

MR. DRUYAN: No, separately by the City. Separately by each of them.

THE COURT: So okay, that's what I was trying to understand. So first by the City.

MR. DRUYAN: Right.

THE COURT: And then B.I. went home. And then, another interview on another day by Commonpoint. And then, another interview on another day by Chazaq, is that what you're saying?

MR. DRUYAN: Yes, and it is possible, Judge, that given the City and the subway system, you know, he could have been interviewed in the morning at the City like an employment situation.

THE COURT: Uh-huh.

MR. DRUYAN: And like an employment agency, and they said okay, at 10:00 in the morning, your qualifications which

apparently include religion, you go the Jewish organization in Queens and in the City, you know, the subway runs, you could get anywhere in the City.

THE COURT: But Mr. Druyan, I'm sorry, since B.I. Is your client, do you not know the information? Do you not know how it actually happened as opposed to speculating?

MR. DRUYAN: My understanding is that he had individual interviews at each Defendant.

THE COURT: Okay.

MR. DRUYAN: And that's why we wrote this complaint under the federal rules. It's certified it as true and correct.

I don't know if it happened on the same day. I don't know if it's that important, but then, even if there were not say arguendo, and you know, I've had a lot of time, the Defendants may say, well, we didn't see him in person. Commonpoint may say we only looked at his resume.

And looking at the resume, we qualified him and we sent him over to the other Jewish charity. I would say that that also qualifies under all the employment criteria, under all the third-party contract criteria under the -- everything and all the actions in the complaint a breach of duty to the infant because, you know, there's more here than, you know, volunteer and the incident where the child is like walking by the building.

You know, it's not as if, you know, he strolled past Commonpoint and said, oh, I'm going to sue Commonpoint because I walked --

THE COURT: Okay, so --

MR. DRUYAN: -- past their place.

THE COURT: So your so Commonpoint, since your client had a face-to-face interview with Commonpoint, he was aware of Commonpoint at that point, right?

MR. DRUYAN: Well --

THE COURT: You seem to be saying that they've been hiding and you can't find them, but he had contact with Commonpoint at the interview stage, correct?

MR. DRUYAN: He had contact, but he didn't know their identity as such because he wasn't given any papers. He's an infant.

He barely knew -- he certainly knew the City and he certainly knew Chazaq, but the fleeting contact with Commonpoint, the infant was not given paperwork or receipts or anything that would identify Commonpoint in a legal standard.

THE COURT: Okay.

MR. DRUYAN: Now --

THE COURT: All right. So, Mr. Druyan, let me ask you. For there to be a joint employer, does there need to be a formal employer?

MR. DRUYAN: I would say yes.

THE COURT: Okay.

MR. DRUYAN: And the normal --

THE COURT: And who is the formal employer in this case?

MR. DRUYAN: I would say formally all of them are the joint employer.

THE COURT: No, no. These -- but you're mushing everything up. I'm trying get clarity.

MR. DRUYAN: I know, I am. Yeah.

THE COURT: Yeah, I know you -- I know that's how you've been thinking, but you know, literally under the law, there are very clear things that I need to make findings on.

And so, I'm trying to see if you can help me. So who was the formal employer and then who are those joint employers?

MR. DRUYAN: Well, I would say since the City is paying that the City is a formal employer. And that pursuant to the contract, and the child ends up at Chazaq, that Chazaq is also a formal employer.

And that Commonpoint being in the middle can be a joint employer, but you can't -- I would submit that you could have two formal employers in partnership and shared employer responsibility here as these Defendants created this.

THE COURT: Right, and since Chazaq -- did Chazaq pay B.I.?

MR. DRUYAN: Chazaq supervised the payment. My

understanding is that the money came from the City by way of a debit card, but excuse me, Chazaq had to certify the hours and the work --

THE COURT: Okay. Right, because the case law, again, very clear says in order for there to be a formal employer relationship, there must be -- you must get paid by that employer, Chazaq, right?

MR. DRUYAN: Well, I would submit to you that what is payment? The money that --

THE COURT: That's -- there's a legal answer to that.

MR. DRUYAN: No, no, I would submit to you respectfully that, you know, it seems like, you know, the old days when I got paid, you know, in a job like this, you'd get a check. But here, my understanding there's a debit card.

Now I'm -- I believe that Chazaq gave the debit card to the infant. Or the debit card came in the mail or the City gave it to the infant, but I don't know --

THE COURT: Mr. Druyan, you know this because the infant is your client. So you don't know how he was paid? You -- again, you're speculating?

MR. DRUYAN: No, the problem I have is being an infant, and not being an infant, you know, preparing for litigation, but an infant from a yeshiva, who's walking around to these institutions, he -- the child didn't even know really what was going on. Now the infancy --

THE COURT: No, but if he knows who gave him the money, right? Where --

MR. DRUYAN: They didn't give him any money, Judge.

THE COURT: All right.

MR. DRUYAN: They gave him a debit card.

THE COURT: I'm sorry, the debit card, who gave him the debit card?

MR. DRUYAN: I believe it was the City or Chazaq. I don't believe it was Commonpoint.

THE COURT: Uh-huh, okay.

MR. DRUYAN: But I am not certain of that. And if no one can tell us who gave him the debit card, I'd request further briefing or an evidence hearing on that critical issue because the fact that the Defendants created a situation --

THE COURT: No, Mr. Druyan, again, we're talking about facts. And you're supposed to make factual allegations.

And I know there are certain things you don't know, but you have a client. And when we're talking infant, we're not talking about, you know, a three year old child. We're talking about somebody who was and may still be a teenager. So somebody who has a certain degree of ability to know what's happening and to be able to communicate.

And so, when there are these issues of who paid, you are supposed to allege facts that tell the Court the basis of that information, right?

So if you're saying payment, you may not know exactly who will get the funding way, you know, behind the scenes, but you can certainly say that that payment was given to the Plaintiff by you know somebody at (indiscernible) court through the mail or from the City or something like that.

And the same thing with all these other elements. You know, that you are saying that the -- all three Defendants or the Defendants and Chazaq are all responsible for the location of the work.

And they're all able to determine the duration of the relationship. All have the right to assign additional projects.

You know, that's simply going through the Reed elements. Reed doesn't say as long as you invoke the magic words of what these elements are, that you -- that's sufficient.

Reed says you have to have facts. You have to allege facts, so that the court can apply these elements.

And so, I've been looking for facts. And I'm getting a lot of, well, all of them did it. And I'm not sure that that's exactly what happened because I'm not getting specific facts that are being alleged.

So that's why I'm struggling a bit and trying to give you an opportunity to tell me what it is you mean or the point --

MR. DRUYAN: Well --

THE COURT: -- places in the complaint that tell me that.

MR. DRUYAN: Well, Your Honor, I apologize. I will tell you this that the infant, based on this what happened to him, was very distraught.

And he was not able to articulate a lot of these facts. And you know, part of the damage was his emotional distress and loss of memory.

And I -- you know, it's not an adult like in the cases where you have an adult intern at Fox News or college interns. This was, you know, a high school student, who just didn't know exactly what was happening to him.

And as you analyze the case, I would beg you that, you know, if we're missing facts, that we be given an opportunity to plead them now that they are of importance.

And I could try to ask the infant again to tell me. But certainly, the Defendants are here. And they could tell us who gave him the debit card.

And you know, how they knew to put money on the card in relation to the hours the child worked.

You know, they didn't just put money in an account like a savings account. It was linked to work hours.

And the work hours came out of definitely came out of Chazaq, not from Commonpoint. So between the City and Chazaq,

and the City is here, they have the answers.

You know, and you know, and if we didn't plead it again, I request, you know, another opportunity.

THE COURT: Uh-huh. All right. And so, I want to wrap up, because we've been going on for a long time.

Just to get clarification, you're not bringing a Title IX claim or you are?

MR. DRUYAN: If I didn't list it, I'm not bringing it. Thank you.

THE COURT: Okay. And for -- I'm trying to understand what was the -- after this incident happened and granted with all we all agree was horrific, did your client -- did your client continue to work at Chazaq or?

MR. DRUYAN: What happened was --

THE COURT: He left?

MR. DRUYAN: No, they told him not to come back.

THE COURT: Uh-huh.

MR. DRUYAN: And --

THE COURT: Okay.

MR. DRUYAN: -- he got paid a week or two after he stopped going there, but that ended also a week or two later.

THE COURT: Okay.

MR. DRUYAN: So he didn't quit. They told him, you know, you can't work here because the police got involved with Saphirstein, who is their employee.

And you know, the element of retaliation you know they sort of took, you know, they sort of took -- you know, they punish the victim and said don't come back. And he did get paid a week or two more. And then --

THE COURT: Right.

MR. DRUYAN: -- you know, the job was gone. And then at some -- yes, Your Honor.

THE COURT: No, go ahead finish. Yeah, I know this whole thing about Saphirstein showing up at the yeshiva.

But from what you just told me, it's not pled in the complaint. You said this is public retaliation, but there's not a single word as to that in the complaint. So I --

MR. DRUYAN: The way.

THE COURT: -- do not see that this is the basis of retaliation.

MR. DRUYAN: Well, I say paragraph 26 at a later date Saphirstein visited as an approved --

THE COURT: I understand that, but that happened somewhere else. And at that point, it sounds like B.I. had already stopped working, right?

MR. DRUYAN: Clearly, the child was not working, but I submit to you that this concept of retaliation would include for the infant, his being expelled from the yeshiva, which punished him, and victimized him again because of this apparent incident and the child being damaged --

THE COURT: Uh-huh.

MR. DRUYAN: -- because of this incident. And that the damages and the retaliation include aside from losing the job, he then loses his ability to attend the Jewish yeshiva.

So he's further damaged. And it's -- that's alleged in paragraphs 29 to 33, 34 emotionally damaged, lame and disabled.

And then, I label, you know, the statutes and --

THE COURT: Okay, all right, Mr. Druyan.

Okay, so let me give the Defendants an opportunity to make any closing remarks, if they'd like.

So, Mr. Milstein, I'll start with you.

MR. MILSTEIN: Yes, thank you, Your Honor. One thing I would address is that it is the Plaintiff's burden when bringing a complaint to bring well pled claims of negligence or claims of any wrongdoing.

I respectfully argue that in the complaint, there are no well pled claims of any negligence, any violation of Title VII, any violation of the State human rights law, any violation of the City human rights law.

And again, I would reiterate further that we -- I think we all agree now that Chazaq employed Saphirstein. It is again my position that Commonpoint did not employ B.I. either.

And the last thing that I would note is that throughout the claim, even throughout the arguments today,

Plaintiff's counsel has failed to address the discriminatory allegations here.

We haven't heard any allegation that any of the actions were taken because of the infant's gender, or his religion, or any other protected class.

Plaintiff's counsel has said several times that it would be essentially, in the interest of fairness in the interest of justice, that he should be allowed to bring a complaint.

But he -- no one's saying he can't bring a complaint for intentional tort against Saphirstein and he got named Saphirstein. And he did bring a complaint against Chazaq.

The only thing -- the only point of my motion is that under our federal employment law or State employment law or City employment law, to have to well pled claims of discrimination. And those simply are not present here. So thank you, Your Honor.

THE COURT: All right. And let me -- Mr. Toews, why don't you -- what you want to say?

MR. TOEWS: Thank you, Your Honor. I just have a couple of very brief closing points. So I just want to state first, I don't share Mr. Druyan's understanding that he -- that the Plaintiff was subject to an in-person interview, although I acknowledge that there is an allegation in the complaint that there was an interview.

But I think it's quite clear when you look at -- a reviewed simply of the website of DYCD's website, it's a one-page application.

And if you take a look on what's included, they're very, very basic biographical facts. There's also a one-page list of documents that are needed to be submitted.

So I would take issue with the idea that the City of New York or Department of Youth and Community Development did any sort of appraisal or evaluation of the characteristics, qualifications, certainly not of the Plaintiff's religion

But I think in addition and sort of piggybacking on what Mr. Milstein said, even if we assume that there was some sort of evaluation, it's very clear that this is -- it's a program, not a job in and of itself.

The Department runs the youth employment program. I mean, it's also called Work Force Connect. So the role of the city here is to connect applicants, who are interested and in the program through Commonpoint to employers. The employer here again would be Chazaq.

So I think that's the primary point. I just would finally say again with respect to what Mr. Milstein mentioned with these negligent claims, negligence claims, state law claims, we also echo the notion that there's not enough pled in the complaint here and there's no duty.

I don't even common, you know, basic concepts of

negligence law to me don't tie the City where the connection is attenuated we're simply running the program.

I mean, there's no allegation or suggestion in the complaint that there's a special duty created that the Plaintiff might have reached out to somebody the City would then assure them, and make some promises, which none of that exists in the complaint nor is there any reason to think that that would have happened under this situation.

So I would again say I don't think the negligence claims can survive regardless of whether or not we assumed that there was an in-person interview. That's all I would say, Your Honor

THE COURT: All right, thank you. And for the Defendant, is it -- is this a question of who the employer is a question that should be decided on summary judgment rather than on a motion to dismiss?

Because it is very fact intensive. There has been some discovery done, but there seem still be some gaps in terms of what actually happened with this particular individual and the supervision and control over his job or work.

So is this something that can be and should be decided on a motion to dismiss? Or is it something that as long as the -- there are allegations as to the employment relationship, that that should await full discovery, so that there could be a motion for summary judgment with the full

record?

MR. MILSTEIN: This is Daniel Milstein. And I think it can be decided at present. You know, the factual allegations that are in the complaint all say, including the documents that are incorporated by reference to the complaint, they all point to Chazaq as the employer. The allegations are that he worked at Chazaq. He -- his hours were set by Chazaq. His job duties were set by Chazaq.

Like it's -- you know gets into the fact intensive inquiry, but at the same time, as the facts that are pled, they don't leave much ground for a finding that there -- Commonpoint can be an employer here.

Plaintiff's counsel even said there's no way for him to know about Commonpoint because the involvement was so fleeing.

The -- it's a burden of the Plaintiff at the outset to set forth a plausible claim of negligence. The complaint doesn't do that. And simply saying there may possibly be facts isn't enough to allow the Court to infer that there are facts.

Plaintiff's counsel will still have to point to some facts that could lead to a finding of negligence.

THE COURT: I'm more focused on the Title VII rather than negligence.

MR. MILSTEIN: Oh, VII, I'm sorry.

THE COURT: So for Title 7, for an employer, because

it is employment discrimination, you know, and the law here the cases that are decided are not fully consistent.

Sometimes there's a finding that there's training and an intern, who's getting paid by different source, and therefore is not an employee and covered in -- under the employment discrimination laws. I'll focus on Title VII.

And then sometimes, they say well, you know, there is because for various reasons. And then sometimes they'll say there is for this entity, but for not that entity.

And then, sometimes very often, it's being decided on summary judgment. And I saw a case recently, I can't remember which one, where the City didn't -- another party made a motion to dismiss and the City didn't.

And there was a footnote that judge, you know, of course, this is issue will be decided later on in summary judgment as to the City.

And so, it's just -- it seems very complicated. And so, I'm just trying to figure out whether it's something that I as the Court have enough information to say definitely it's not -- you're not the employer to Defendants here.

Or, you know, given that the different elements in Reed were recited in the complaint, and there are some facts in the contracts that give me some clues as to who's supposed to do what.

But I don't have a decision transcript or, you know,

that kind of thing to say what actually happened here.

And so, I'm just wondering whether this is something that really is a summary judgment -- I'm sorry, a motion to dismiss kind of decision or whether it really requires with benefits from a full record.

MR. MILSTEIN: This is Daniel Milstein again. And I would submit the O'Connor case, for example, says that that there must be some form of remuneration for there to be a finding of employment -- employer-employee relationship in the first instance.

From Commonpoint's perspective, we know he wasn't paid. And then, there's also ample case law that says even incidental benefits aren't sufficient.

There has to be something more concrete, something along the lines of a pension or disability retirements benefits, things of that nature.

The allegation in the complaint I think are very clear in this regard that he was not getting any of those benefits from Commonpoint. There's never any attention to and he did not, so this --

THE COURT: So you think that that's very clean in that respect?

MR. MILSTEIN: I do, yes.

THE COURT: And alternatively, is it enough to say Saphirstein was employed solely by Chazaq, and therefore, no

liability for his actions in Commonpoint?

MR. MILSTEIN: I do, yes, because again, this is still an intentional tort from Saphirstein.

THE COURT: Well, Title VII.

MR. MILSTEIN: (Indiscernible) want to be -- Title -- I keep going back, I'm sorry.

THE COURT: Yeah, I know.

MR. MILSTEIN: Yeah. Yes, because that -- because Saphirstein's actions could not be attributed back to Commonpoint. The duty here for Commonpoint, which confined any suitable employment for B.I.

They did so. But what happened with Saphirstein, he was not even listed as a supervisor on the employment form that Chazaq provided. Those are incorporated into by reference of complaint and could be considered here.

Chazaq identified the five supervisors. Steven Saphirstein is not one of them. And going back to Title VII and then you still would have the employer employee -- the rubric set forth by Reed that the Court would have to consider to determine whether he was an employee. And the facts are clear there that it was still Chazaq, if it was anybody.

THE COURT: Uh-huh.

MR. TOEWS: And Your Honor, this is Mark Toews. I just want to again sort of piggyback on what Mr. Milstein said. I think -- and referring back to what Your Honor noted when

we're talking about, you know, is it necessary to definitively define who the employer is?

And I respectfully submit it's not for the purposes of the motion for -- motion to dismiss and that as Mr. Milstein just said, if it's anybody, it's Chazaq.

And I think it's clear and I think Your Honor can find from the allegations in the complaint that Chazaq is almost certainly the employer.

But in any event, neither the city nor Commonpoint are. And that's based on things that Plaintiff does allege, the -- a description of the work as Mr. Milstein said how it was performed, the responsibilities, requirements, and so on.

So I do think the Court can find as a matter of law, based upon the allegations and the descriptions in the complaint of, you know, who's ultimately responsible here.

And again, respectfully, we don't believe it's the City. And Mr. Milstein said, I mean, you look at that application, and if the Court reviews the application that's incorporated, by reference, he's not named.

I don't see how the City could be frankly responsible for without notice or some reason to believe that the alleged events are going to transpire that we -- that the City of New York could be held responsible for this third-party's allegedly terrible conduct. That's all.

MR. DRUYAN: Your Honor?

THE COURT: Okay, hold on a second. I have one more question. So the -- if I don't have to find who the employer is, then I could still -- would there -- let me back up. Is it a pleading failure? Because if it's a pleading failure, it could be fixed by a third amended complaint. So you can you speak to that issue?

MR. MILSTEIN: Yes, this is Daniel Milstein. I do not believe it's a pleading failure. I believe it's the facts as alleged. It's the facts that exist.

THE COURT: Uh-huh.

MR. MILSTEIN: The complaints against Commonpoint and effectively the City seem to be this I would say visceral argument was that because there's money in play, there may be some relationship, there may -- like they perhaps Chazaq would not exist if they would not have the funding. Perhaps Commonpoint would not exist if they had the funding.

There will always have to be more than that. These aren't -- Plaintiff's counsel isn't looking for to -- we suddenly amend the pleading. There's just simply no facts that are present.

The facts are that he was at Chazaq and he was working for Chazaq and try and doing clerical work there to help Chazaq.

There's no benefit to Commonpoint. There's no benefit to the City. Like what happens to the contracts is

incidental to that inquiry.

And indeed, the contract says in no uncertain terms that there are no other intended beneficiaries.

THE COURT: Uh-huh.

MR. DRUYAN: Judge?

THE COURT: Okay. And Mr. Druyan, I'll get you in a moment for response to that, but I just had another question, which is on a motion to dismiss I'm supposed to take the allegations as true unless they're contradicted by the documents that are attached.

What parts of those documents do you want me to consider as contradicting the allegations?

MR. MILSTEIN: This is Daniel Milstein. I would say that the Chazaq work site application and the infant's own application both contradict any allegation that Commonpoint could be deemed the employer or provider of B.I. or Chazaq or of (indiscernible), which hasn't been established at this point.

These documents (indiscernible) not only that B.I. was aware of Commonpoint before the lawsuit was brought, but that all the -- that the level of control necessary to find an employer-employee relationship that all lay with Chazaq. I think those documents contradicts the complaint.

THE COURT: Okay, all right, great. Thank you.

And Mr. Toews, did you want to speak to that

question?

MR. TOEWS: We take essentially the same position just because the employer-employee relationship. Nothing further.

THE COURT: Okay, great. And then Mr. Druyan, I'll give you the final word.

MR. DRUYAN: Contrary to Defendant's arguments, Chazaq did not have the complete and final say as to payment because in fact payment was coming from the City and Chazaq set the hours and the work of employment.

And the Defendants by their arguments say, well, there's nothing in the complaint. Only money was at play.

But certainly, over the two hours we've been having the oral argument, the contracts were in play because the contracts determined how the money was allocated among the Defendants for their contract and to the infant as the employee.

And the benefit of those contracts went to the Defendants who received funding for the program and to the City, which contracted out the program to these Defendants.

So they were all beneficiaries. It was more than money. It was contracts. And the contracts determined the details of the infant's employment at Chazaq.

So, you know, the Defendants who are left certainly point their finger at Chazaq and say, you know, we had nothing

to do with that.

But the facts show enough to get past the motion to dismiss and we would respectfully say possibly in the future at summary judgment, when we find out more facts, that the situation is murky.

But under the concept of, you know, joint and several liability, the murkiness of the relationship of these Defendants should not at this point lead to dismissal on this motion, but the action should continue.

And if I need to amend the pleadings or we need to have additional discovery to fill in the facts, but it's more than money and more than simply saying, well, we had nothing to do with Chazaq. They were the employer.

That's not what the facts show, Your Honor. And you're familiar with that. And you've been generous with time this afternoon and I thank you. And that's it. That's what Plaintiff argues.

THE COURT: Uh-huh, all right. Well, thank you, everybody. This has been really interesting and really helpful.

It's taken a bit longer than I thought it might, but it has been very good and I appreciate very much everybody's clarity and directness in answering my questions.

So I hope to get a decision out soon. And I hope that that will make clear what I'm thinking on this case.

All right, I don't think I have anything else. Let me just look. Next steps will be determined once I issue the decision. So thank you, everybody. Have a great day.

MR. TOEWS: Thank you, Your Honor. Have a great day.

MR. DRUYAN: Bye bye.

MR. MILSTEIN: Bye.

(Proceedings concluded)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_________________ September 23, 2022

Chris Hwang Date

Court Reporter